## SOUTHERN RAILWAY COMPANY *v.* HILL.

1. There was evidence to warrant an instruction that if plaintiff were entitled to recover at all, he might recover for future probable pain and reduced capacity to labor.

2. The charge as to punitive damages was not without evidence to authorize it.

3. Where the circumstances were such as to authorize a jury to find that an engineer operating a locomotive of a railway company was bound, in the exercise of ordinary care, to anticipate the perilous situation of one on the company's right of way with his team, it was not error to refuse to instruct the jury that the company owed such person no duty until he was actually seen by the engineer.

4. The contention of the plaintiff being that his team was frightened and caused to run away by reason of the negligent and wanton acts of an employee of the defendant, the court did not err in refusing a request to give a charge which designated the occurrence under investigation as an "accident."

5. There was·evidence to authorize the verdict; it does not appear to be excessive; and the court did not err in refusing a new trial.

Argued January 20,—Decided May 14, 1906.

Action for damages. Before Judge Fite. Whitfield superior court. July 15, 1905.

William Hill brought an action for damages against the Southern Railway Company. The substance of the petition was: Plaintiff was driving three mules, hitched abreast to a grain binder, on his way to the field of one Nichols. One of the mules and the grain binder were his property. In order to reach the field, it was necessary to drive along a private road over defendant's right of way. This private way was much used by the public, crossed defendant's tracks on a crossing provided and kept up by it, and was a place where the presence of teams should be constantly expected. While plaintiff was driving along this private road, and just before he reached the gate to the field, a locomotive on defendant's track came backing from the direction towards which plaintiff was driv-

ing. It came quietly and slowly, without frightening plaintiff's team, until just before it came opposite, when "the engineer suddenly and violently hastened the speed by turning on much more steam; he opened the cylinder-cocks and thus added a shrill hissing sound to those it was making; a dense cloud of smoke and sparks suddenly issued from the smoke-stack and, together with the steam from the cylinders, enveloped petitioner and his . . team in a volume of smoke and steam," all of which frightened the team and caused it to run away and injure plaintiff, his binder, and mule, as set forth. The engineer was in full view of plaintiff and his team, and was looking directly at them when he did the acts above mentioned which caused the team to run away, and such acts were wanton and malicious and done with intent to frighten plaintiff's team. "The noise so made by the engine, and the increased speed thereof, and the emission of smoke and steam therefrom were all unnecessary and unusual in the running of said engine," and the damages to plaintiff, as set out, were caused by the misconduct and negligence of defendant's engineer, plaintiff at the time being in the exercise of all ordinary and reasonable care and being at a place where he had a right to be and where the defendant permitted his presence. The suit was for the plaintiff's personal injuries and the damages to his mule and binder. The answer of the defendant put in issue the material allegations of the petition.

It appeared on the trial that the scene of the transactions in question was Varnells, a station on defendant's road, where there were two parallel tracks, a few feet apart, running north and south for something like a thousand yards, and connected by switches, one of which was about four hundred yards north of the depot. There was a water-tank south of the depot, and a public road crossed the tracks at the depot. On the east of the tracks, and beginning about two hundred yards north of the public road, lies the Nichols field, the fence inclosing it running north along the right of way of the railway company, about parallel with the tracks and thirty or thirty-five feet therefrom, to the gate nearly opposite the north switch. The private road along which plaintiff was driving when his team was frightened ran between this fence and the tracks, about fifteen or twenty feet from the nearer track. Plaintiff drove east across the tracks, along the public road at the depot, and saw a freight-train approaching from the south. He drove some forty or fifty yards

east of the tracks and then waited for the train to pass on north. After it had passed he drove into and along the private road, between the tracks and the fence, towards the gate, for the purpose of there entering the field and cutting the wheat therein. When he had gone about half the distance between the corner of the fence and the gate, the train, which had passed him before he drove into the private road and had gone beyond the north switch, stopped and backed on to the other track. The engine was cut loose, run back upon the track it was first on, and was then back south along this track, on its way to the tank for water. Plaintiff continued to drive towards the gate, and had almost reached it before the engine got opposite to him. The private road was on defendant's right of way, had been in use for at least eighteen years, and was much used by the public generally, as well as by persons who hauled wood, bark, etc., to be loaded on cars standing upon the switch-track near the private crossing which was kept up by defendant. Plaintiff testified, that when the train passed him, going north, it was going at a rapid rate, that he saw no signs of its stopping, and thought it was going on, and therefore he drove towards the gate, along the private road, between the fence and the tracks. When he saw the train had stopped, and discovered that the engine was coming back, he could not get out of the place he was in before the engine would pass him, and knew that by going on he "wouldn't be in a closer place" than he was then, as he was then as close to the track as he would be at the gate. The engine came back slowly, making very little noise, until it was about twenty or thirty feet north of a point opposite him, when the engineer, who was looking directly at him, opened the "cylinder-cocks and pulled his engine open, throwing out smoke and steam all over the team," thereby frightening it and causing it to run away. The team was not frightened until the steam, smoke, and noise were produced by reason of the engineer pulling "the engine open." Plaintiff held the reins to two of the mules, while a boy held the lead mule by the bit. Plaintiff remained on the binder because he thought he could hold the team there better than he could if he were on the ground. After the team was frightened, as stated, and was rearing and endeavoring to run, the reins, which were ordinarily good leather reins, broke, and the team instantly ran away. Plaintiff was forty-five years old at the time he was hurt, was a farmer, and his services were worth $200

a year before he was injured, and he can not do more than half as much work since his injury as he could do prior to that time. The plaintiff also described his injuries and the damages to his binder and mule. The testimony of two other witnesses tended to support that of the plaintiff. The engineer and several other witnesses testified, for the defendant, that no unusual or unnecessary noises were made by the engine at the time plaintiff's team ran away; and the engineer testified that he did not see plaintiff or his team at the time it was frightened. There was a verdict in favor of the plaintiff for $631.25, and defendant excepted to the overruling of its motion for a new trial.

*Shumate & Maddox,* for plaintiff in error.

*R. J. & J. McCamy,* contra.

FISH, C. J. (After stating the foregoing facts.)

1. The court instructed the jury that if, under the law and the facts, they were of opinion that plaintiff should recover, "then you will ascertain as best you can from the evidence whether or not the injury is likely, or probably will last for some time to come, and if so, how long, and what will be, if anything, [plaintiff's] reduced capacity to labor for the time the injury will last." Error was assigned on this and several other instructions of similar import, upon the ground that they authorized the jury to find damages for permanent injuries, when there was no evidence of permanent injuries. Plaintiff testified that he was injured June 10, 1903. The trial occurred during the April term, 1905, and he then testified: "Since the accident I am hurting all the time except when I am in bed, straightened out. I have just a dead, aching misery in my side. At times it seems like my hip is all right, but if I start out and walk any distance or exert myself in any way, my hip gives out and I can hardly get along; this condition was not there before I was hurt; before I was hurt I could do work, but now I don't do any hard work. I do some light work on the farm. Haven't done a hard day's work since it happened, because I am not able to do it." "I can't do half as much work now as I could before the accident." The court nowhere in the charge used the words "permanent injuries." We are of opinion that from the evidence as to the character of plaintiff's injuries, and the length of time—nearly two years— he had continued to suffer therefrom, the jury was authorized to infer that his reduced capacity to labor and his pain would probably

continue for some time in the future; and hence the assignments of error on the instructions on that subject were not well taken. *Southern Cotton Oil Co.* v. *Skipper,* post, 369, and cit.

2. Under the uncontradicted evidence, the plaintiff and his team, at the time it was frightened, were within fifteen or twenty feet of the railroad track on which defendant's engine was running. There were no cars then attached to the engine, and it was running backwards towards plaintiff's team, which was, relatively to the engine, on the engineer's side, and the team was going towards the engine. The plaintiff and another witness testified that the engineer was looking directly towards the plaintiff and his team and saw his peril, when the engineer caused the alleged unusual and unnecessary noises to be made by the engine and the steam and smoke to escape, which frightened the team. There was, therefore, ample evidence to authorize the instructions on the subject of punitive damages, for the jury might have found, from this evidence, that the acts of the engineer were unnecessary, wanton, and malicious. *Southern Railway Co.* v. *O'Bryan,* 119 *Ga.* 147(1), and cit.

3. Error was assigned upon the refusal of a request to give in charge the following: "Even if the engineer did any unusual and unnecessary thing, it could not affect this case, unless at the time, if such thing were done, the engineer saw that the plaintiff and his team were in a perilous situation." Another assignment of error was, that the court refused a request to give in charge the following: "I charge you that if the engineer in charge of the engine did not see the plaintiff, and did not observe the danger of the plaintiff, he owed him no duty, the only duty owed by the defendant to the plaintiff being not to do any wanton act to injure the plaintiff; and if you find that the engineer did not see the plaintiff and did not observe his danger, he owed the plaintiff no duty to avoid the danger to him." Plaintiff's case was based upon two theories; (1) that the engineer wantonly and maliciously increased the speed of the engine and caused the escape of the smoke and steam, with intent to frighten plaintiff's team, which was frightened thereby and made to run away; and (2) that the increase of the speed of the engine, the escape of steam, and the emission of smoke were all unusual and unnecessary and created unusual and unnecessary noises, which were likely to frighten teams and which did frighten plaintiff's team and cause it to run away. To sustain the

first theory it was, of course, necessary to show that the engineer knew of the presence of plaintiff's team. Was it also necessary, in order to sustain the second theory, to show that the engineer saw the plaintiff and observed his danger at the time the alleged unusual and unnecessary noises were made? The general rule is, that, as to a trespasser, the agents of a railroad company operating its trains are not bound to anticipate his presence upon the tracks or property of the company, and that their duty to exercise ordinary care and diligence for his protection does not arise until his presence there is known to them. This general rule does not, however, relieve the agents of the company under all circumstances from anticipating the presence even of a trespasser upon the track or property of the company, and from taking proper precautions to prevent injury to him. For where the circumstances are such that the agents of the company in charge of its train are bound, on a given occasion, to anticipate that trespassers may be upon the track or property of the company at a given place, such agents are under a duty to take such precautions to prevent injury to such persons as would meet the requirements of ordinary care and diligence. *Southern Ry. Co.* v. *Chatman,* 124 *Ga.* 1026, and cit.; Hopkins' Law of Personal Injuries, §87. The plaintiff in the case under consideration was not a trespasser. He was driving along a private road on the railway company's right of way, but this road had been in continuous use by the public for at least eighteen years, and the crossing where it went over the company's tracks had been constructed and kept in repair by the railway company. The uncontroverted evidence was that this road was frequently traveled, and two of the witnesses even referred to the crossing over the railroad tracks as a "public crossing." The plaintiff was, therefore, at least a licensee, and the degree of duty due him by the employees of the defendant company was certainly not less than it would have been had he been a trespasser. Applying the rule as to trespassers to the plaintiff's case, if the circumstances were such that the engineer in charge of the defendant's engine was bound to anticipate that the plaintiff and his team might be where they were on the occasion in question, then the engineer was under a duty to take such precautions to prevent injury to plaintiff and his team as would meet the requirements of ordinary care and diligence. The circumstances in evidence were sufficient to authorize a finding by the

jury that the engineer was bound to anticipate that the plaintiff and his team might be in the private road, within fifteen or twenty feet of the railway track, and that the making of the alleged unusual and unnecessary noises would likely frighten the team. The engineer testified, in part, as follows: "I saw a team of mules on the right-hand side of the track as you go north, that day. I headed in at the south end of the passing track at Varnells Station that day; this is the track on the left-hand or west side of the main line. I didn't see the mules at all as I passed in on the track. . . When I first saw the mules they were coming up the road, probably 100 yards below this gate, that is south of the gate; they did not seem to be frightened when I noticed them. I did not see any one but the driver handling them; . ·. at that time I wasn't going over three miles an hour, the engine was just barely moving; the engine was not making any noise but the exhaust, no unusual noise; . . there was no more steam escaping than is usual for an engine moving as this one was. . . I did not know the mules were frightened at all. After I moved back from the side-track one of the boys came over and told me that the mules got scared, and that was the first that I knew of it. I could not have carried that engine back with less steam. I had no malice against this plaintiff; I had not a bit of desire to have some fun out of him; I did not see him when he ran into the gate. . . When I cut my engine off, I saw the mules coming up the road, and I didn't pay any more attention to them. When I cut my engine off I was about half way between the gate and Caylor's store [which was near the corner of the fence next to the depot]. I stopped about 100 feet back in the clear from the switch; at that time the team was over east of the railroad and about 100 feet north of the public crossing [at the depot]. I don't know how far from the railroad they were. . . As I came back with my engine I didn't see the mules at all, as my attention was attracted to something inside of the engine." The engineer was bound to know of the existence and situation of the private road and that it had long been traveled by the public; and as he saw the team "coming up the road" when the engine was being uncoupled from the cars, it certainly seems that by the exercise of ordinary care he would have discovered the team of three mules, hitched abreast to a grain binder, coming towards him along a road fifteen or twenty feet from the track on which his engine was·

and on the side next to him. At any rate, it is quite clear, as we have already said, that the circumstances were such as to authorize the jury to find that the engineer was bound to anticipate that the plaintiff and his team might be in the road near the track, and that the unusual and unnecessary noises might frighten the team and cause it to run away. This being true, it was the duty of the engineer to take such precautions as ordinary care required not to frighten the team, even though he did not, at that particular period of time, see the perilous situation of plaintiff and his team. From what we have said, it follows that the court did not err in refusing to instruct the jury as requested.

4. Another complaint in the motion for a new trial was, that the court erred in refusing a request to give in charge the following: "If you find that the proximate cause of the accident to the plaintiff was the cause [because?] of the breaking of the lines with which the plaintiff was driving the mules hitched to the binder, he would not be entitled to recover." As the word "accident," in its most commonly-accepted meaning, denotes an event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause; or an unusual effect of a known cause, and therefore not expected; chance, casualty, contingency (1 Cyc. 227), it is clear that it would have been improper for the court to characterize the occurrence under investigation as "the accident to the plaintiff," (*Central Ry. Co.* v. *Grady,* 113 *Ga.* 1045 (1) ), the plaintiff's contention being that the occurrence was caused by the negligent and wanton acts of the defendant's engineer.

5. There was ample evidence to authorize the finding of a verdict in behalf of the plaintiff, and we can not say, in view of the evidence, that the amount of the verdict was excessive. The court did not err in refusing to grant a new trial.

*Judgment affirmed. All the Justices concur.*